**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | | |
|---|---|---|
| In re: | ) | Civil Nos. 2008-146 |
| | ) | 2008-147 |
| | ) | |
| JEFFREY PROSSER, | ) | Re: Chapter 7 Case No. 06-30009 |
| | ) | |
| | ) | |
| *Debtor.* | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| INNOVATIVE COMMUNICATION | ) | Re: Chapter 11 Case No. 07-30012 |
| CORPORATION, | ) | |
| | ) | |
| *Debtor.* | ) | |
| | ) | |
| | ) | |
| STAN SPRINGEL, | ) | |
| | ) | |
| *Plaintiff,* | ) | Re: Adv. Pro. No. 08-03003 |
| v. | ) | |
| | ) | |
| DAWN PROSSER, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| | ) | |
| JAMES CARROLL, | ) | |
| | ) | |
| *Plaintiff,* | ) | Re: Adv. Pro. No. 08-03006 |
| v. | ) | |
| | ) | |
| DAWN PROSSER, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**CHAPTER 11 TRUSTEE'S PRE-TRIAL MEMORANDUM REGARDING**
**<u>FRAUDULENT TRANSFER ACTION</u>**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................................1

II. PROCEDURAL AND FACTUAL BACKGROUND ...........................................................2

III. ARGUMENT AND AUTHORITIES ..................................................................................5

    A.    Dawn Prosser is Liable Directly to the ICC Debtors' Bankruptcy Estates..............5

    B.    The Transfers Were Fraudulent under Applicable State Laws and Bankruptcy Code § 548.....................................................................................10

        1.    Jeff Prosser Caused the ICC Debtors to Make the Transfers to or for the Benefit of Dawn Prosser...........................................................10

        2.    Jeff Prosser Caused the ICC Debtors to Make the Transfers with Actual Intent to Hinder, Delay, or Defraud Creditors.............................10

        3.    Jeff Prosser Caused the ICC Debtors to Make the Transfers with Constructive Fraudulent Intent .............................................................15

        4.    Even If the Court Determines that the Transfers Were Initially Distributions to Jeff Prosser, They Remain Fraudulent Transfers as to Dawn Prosser that Must Be Returned to the ICC Debtors .................16

    C.    The Post-Petition Transfers Were Not Authorized under the Bankruptcy Code or pursuant to Order of the Court ............................................................19

IV. CONCLUSION ................................................................................................................19

## TABLE OF AUTHORITIES

## CASES

*Anton Noll*,
   277 B.R. at 882 ....................................................................................6

*Bonded Fin. Serv. v. European American Bank*,
   838 F.2d 890 (7th Cir. 1988) .........................................................6, 8

*General Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*,
   185 B.R. 801 (9th Cir. BAP 1995)........................................................5

*In re Hill*,
   342 B.R. 183, 198 (Bankr. D.N.J. 2006) ...................................... 11, 12

*Kachanizadeh v. Denlinger*,
   108 B.R.  734, 736-37 (Bankr. C.D. Cal. 1989) ................................12

*Leonard v. Coolidge (In re Nat'l Audit Defense Network)*,
   367 B.R. 207, 221 (Bankr. D. Nev. 2007)..........................................10

*Mancuso v. Champion (In re Dondi Fin. Corp.)*,
   119 B.R. 106 (Bankr. N.D. Tex. 1990) ...............................................16

*Pereira v. Equitable Life Insur. Society of the United States (In re Trace Int'l Holdings, Inc.)*,
   289 B.R. 548, 561 (Bankr. S.D.N.Y. 2003).........................................16

*Pinto Trucking Service, Inc.*,
   93 B.R. 379, 386 (Bankr. E.D. Pa. 1988) ...........................................12

*Rupp v. Markgraf*,
   95 F.3d 936 (10th Cir. 1996) .....................................................5, 6, 9

*Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*,
   127 F.3d 1195 (9th Cir. 1997) .............................................................5

*Schnelling v. Crawford (In re James River Coal Co.)*,
   360 B.R. 139, 161 (Bankr. E.D. Va. 2007)..........................................10

*Tese-Milner v. Brune (In re Red Dot Scenic, Inc.)*,
   293 B.R. 116 (S.D.N.Y. 2003)........................................5, 6, 7, 8

*Thabault v. Chait*,
   541 F.3d 512, 527 (3rd Cir. 2008)......................................................11

*Venice-Oxford Ass'n v. Multifamily Mortgage Trust 1996-1 (In re Venice-Oxford Ass'n)*,
   236 B.R. 820, 834 (Bankr. M.D. Fla. 1999) .......................................12

US 747434v.1

## STATUTES

11 U.S.C. § 548 ................................................................................................. 1, 3

11 U.S.C. § 548(a)(1)(A) ...................................................................................... 11

11 U.S.C. § 548(a)(1)(B) ...................................................................................... 14

11 U.S.C. § 549 ........................................................................................... 1, 3, 9, 10

11 U.S.C. § 549(a) .................................................................................................. 9

11 US.C. § 550 ........................................................................................... 2, 3, 9, 17

28 V.I.C. § 204 ............................................................................................... 11, 14

28 V.I.C. § 205 ....................................................................................................... 14

28 V.I.C. § 206 ....................................................................................................... 14

FLA. STAT. § 726.105(1)(a) .................................................................................... 11

FLA. STAT. § 726.105(1)(b) .................................................................................... 14

FLA. STAT. § 726.106 ............................................................................................. 14

N.Y. DEBT. & CRED. LAW § 273 ............................................................................ 14

N.Y. DEBT. & CRED. LAW § 274 ............................................................................ 14

N.Y. DEBT. & CRED. LAW § 275 ............................................................................ 14

N.Y. DEBT. & CRED. LAW § 276 ............................................................................ 11

## MISCELLANEOUS

5 *Collier on Bankruptcy* ¶ 548.04[1] (Lawrence P. King ed., 15th ed. 2008) .............................. 11

# PRE-TRIAL MEMORANDUM

Stan Springel ("Trustee Springel"), the chapter 11 trustee of the bankruptcy estates of Innovative Communication Company, LLC ("ICC-LLC"), Emerging Communications, Inc. ("ECI"), and Innovative Communication Corporation ("New ICC" and together with ICC-LLC and ECI, the "ICC Debtors"), files this *Pre-Trial Memorandum* concerning factual and legal issues that are likely to be relevant to the upcoming trial in Civil Case No. 08-146 (the "Fraudulent Transfer Action" and, collectively with Civil Case No. 08-147, the "Fraudulent Transfer Actions") and respectfully states as follows:

## I.     PRELIMINARY STATEMENT[1]

Pursuant to Bankruptcy Code §§ 544(b), 548, and 549, Trustee Springel seeks to, among other things, avoid fraudulent transfers and unauthorized post-petition transfers to or for the benefit of Dawn Prosser.[2] Trustee Springel will establish that, between January 1, 1999 and September 30, 2007, Jeff Prosser directed or otherwise caused one or more of the ICC Debtors to make non-business transfers in the aggregate amount of at least $20 million to or for the benefit of Dawn Prosser.[3] Those transfers were made (i) with actual intent to hinder, delay, or defraud creditors; and (ii) without the ICC Debtors' receipt of reasonably equivalent value (or fair consideration) at a time at which the ICC Debtors were insolvent, had unreasonably small capital, or had debts that exceeded their ability to pay.

The Transfers were made out of the business operating accounts of the ICC Debtors. Because the ICC Debtors, and not Jeff Prosser, were the source of the transfers that Trustee

---

[1] All capitalized terms in the "Preliminary Statement" section that are not defined above shall have the meanings given to them in the remainder of this *Pre-Trial Memorandum.*

[2] Trustee Springel's claims to avoid and recover fraudulent or unauthorized post-petition transfers to or for the benefit of Jeffrey J. Prosser ("Jeff Prosser") are the subject of pending proofs of claim in Jeff Prosser's personal bankruptcy case, and are not addressed in the Fraudulent Transfer Actions.

[3] This amount does not include fraudulent transfers and unauthorized post-petition transfers solely to or for the benefit of Jeff Prosser.

Springel seeks to avoid, the ICC Debtors' bankruptcy estates, and not Jeff Prosser's bankruptcy estate, solely hold the appropriate claims and causes of action to avoid those fraudulent transfers and unauthorized post-petition transfers. Pursuant to Bankruptcy Code § 550, Trustee Springel may recover damages relating to those transfers from Dawn Prosser as the transferee and/or a beneficiary of those transfers.[4]

## II.    PROCEDURAL AND FACTUAL BACKGROUND

New ICC formerly owned, directly or indirectly, 100% of the common stock of various operating subsidiaries that provide telephone, cable TV, internet, mobile telephone, and other services to the citizens of the U.S. Virgin Islands and surrounding areas. New ICC is a wholly-owned subsidiary of ECI, which, in turn, is directly and indirectly owned by ICC-LLC.

Jeff Prosser was an officer and director of New ICC, and the sole member of its ultimate parent company, ICC-LLC. In those capacities, Jeff Prosser exercised pervasive control over the ICC Debtors and utilized their operating capital to pay for a lavish lifestyle for him and Dawn Prosser, characterized by multiple mansions, private jets, luxury automobiles, and accumulating stockpiles of rare wines, fine art, exotic furnishings and extraordinary gems and jewelry. After the commencement of the ICC Debtors' bankruptcy cases rendered the use of the ICC Debtors' funds more difficult,[5] Jeff Prosser began to utilize the funds of direct and indirect subsidiaries of New ICC, including the Virgin Islands Telephone Company, to pay for this extravagant lifestyle.

Dawn Prosser, the Defendant and wife of Jeff Prosser, was a recipient and beneficiary of such funds. Notably, beyond interest earned on any savings, Dawn Prosser has not had any

---

[4] Even assuming *arguendo* that the Transfers did go through Jeff Prosser or his estate, which they did not, Dawn Prosser would still be liable as a subsequent transferee under Bankruptcy Code § 550.

[5] As this Court is likely aware, the ICC Debtors and Jeff Prosser are each debtors in bankruptcy cases before the District Court of the Virgin Islands, Division of St. Thomas and St. John, Bankruptcy Division (the "Bankruptcy Court"). Involuntary petitions for relief were filed against ICC-LLC, ECI (together with ICC-LLC, the "Parent Debtors") and Jeff Prosser on February 10, 2006. The involuntary petition for relief against New ICC was filed on July 5, 2007.

source of income independent of Jeff Prosser since 1989, over twenty years ago, when she worked briefly in an administrative capacity at a bank.[6] Dawn Prosser was never employed by New ICC, nor did she ever provide any services to New ICC. Yet, Dawn Prosser would personally receive personal property, antiques, furnishings and services which were paid for by New ICC and then provided to her benefit.[7] Dawn Prosser claims sole ownership of all such personal property, antiques and furnishings. Jeff Prosser also claims that all such property is solely owned by Dawn Prosser.

Trustee Springel is the plaintiff in Adversary Proceeding No. 08-03003 against Dawn Prosser. Separately, James P. Carroll, ("Trustee Carroll"), the chapter 7 trustee of the bankruptcy estate of Jeff Prosser, is the plaintiff in Adversary Proceeding No. 08-03006 against Dawn Prosser.

A week into trial of the Fraudulent Transfer Actions in the Bankruptcy Court, on December 5, 2008, this Court granted Dawn Prosser's motions to withdraw the reference based upon her demand for a jury trial. *See* Case No. 08-147, DE 9; Case No. 08-146, DE 10. Trial of the Fraudulent Transfer Actions is currently scheduled to commence on March 7, 2011. *See* Case No. 08-147, DE 19.[8]

In the Fraudulent Transfer Action, Trustee Springel asserts claims and causes of action pursuant to, among other provisions, state and territorial laws, as incorporated by section 544(b)

---

[6] Nor has Dawn Prosser sought employment since the bankruptcy filings.

[7] For instance, more than $3.1 million was transferred by New ICC to antique dealer Scott Lindsay to acquire interior decorating services and furniture relating primarily to the Palm Beach house in which Jeff Prosser and Dawn Prosser assert an interest.

[8] The *Trial Management Order* entered in Case No. 08-147 (at DE 19) setting trial for March 7, 2011 includes the caption for Case No. 08-146, and appears to have been only inadvertently not filed in Case No. 08-146.

of title 11 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Code §§ 548, 549, and 550, based upon the following facts, among others:[9]

- Between January 1, 1999 and September 30, 2007, one or more of the ICC Debtors made Transfers of at least $20 million to or for the benefit of Dawn Prosser.[10]

- New ICC continued to make payments to or for the benefit of Jeff Prosser and Dawn Prosser even after bankruptcy. *November 18, 2008 Trial Testimony of Ingrid Christian*, at 181:18-183:22. These payments totaled in excess of six million dollars between February 10, 2006 (the date of the involuntary action filed against Jeff Prosser and the Parent Debtors) and July 31, 2006 (the voluntary petition date for Jeff Prosser and the Parent Debtors). *Id.* Another five million dollars was transferred between July 31, 2006 and September 21, 2007 (the date of the Order for Relief in the New ICC case), with approximately $400,000 of that amount being transferred after an involuntary petition had been filed against New ICC on July 5, 2007. *Id.*

- The Transfers were made with actual intent to hinder, delay, or defraud.

- Dawn Prosser never provided any services to any of the ICC Debtors.

- The respective ICC Debtors did not receive reasonably equivalent value (or fair consideration) in exchange for the Transfers.

- The ICC Debtors were insolvent or became insolvent.

- The Post-Petition Transfers were not authorized under the Bankruptcy Code or by Order of the Court.

---

[9] Certain of the relief requested in the Fraudulent Transfer Actions is pled in the alternative to relief requested in other adversary proceedings. For instance, to the extent that property or transfers subject to Adversary Proceeding No. 07-03010 (the "Turnover Adversary Proceeding") are also subject to avoidance pursuant to the Fraudulent Transfer Actions, such avoidance and recovery shall be in the alternative to the counts and causes of action asserted in the Turnover Adversary Proceeding.

[10] The transfers that were made by one or more of the ICC Debtors to or for the benefit of Dawn Prosser before their respective involuntary petition dates shall be referred to collectively as the "Pre-Petition Transfers," and the transfers that were made by one or more of the ICC Debtors to or for the benefit of Dawn Prosser on or after their respective petition dates shall be referred to collectively as the "Post-Petition Transfers." The Pre-Petition Transfers and Post-Petition Transfers shall be referred to collectively as the "Transfers".

## III. ARGUMENT AND AUTHORITIES

### A. Dawn Prosser is Liable Directly to the ICC Debtors' Bankruptcy Estates

Each of the Transfers was made by one or more of the ICC Debtors directly to (i) Dawn Prosser or (ii) a third party for the benefit of Dawn Prosser. In the latter scenario, the third party provided goods and services to Dawn Prosser in exchange for the ICC Debtors' payment for such goods and services. The Transfers were *not* effectuated by one or more of the ICC Debtors transferring funds to (i) Jeff Prosser who then transferred those funds to Dawn Prosser or a third party for her benefit; or (ii) a third party who provided goods or services to Jeff Prosser, who then provided those goods or services to Dawn Prosser.

This distinction is easily explained by way of example. New ICC made payments in the aggregate amount of $409,596.03 directly to Jerry Mann, a project manager, with respect to the St. Croix mansion (the "Estate Shoys"), which Jeff Prosser and Dawn Prosser claim is solely owned by Dawn Prosser. The construction of the Estate Shoys mansion had nothing to do with the actual business of New ICC. The Transfers were made to Jerry Mann by checks drawn on New ICC's bank account. New ICC did not transfer the $409,596.03 to Jeff Prosser, who then paid Jerry Mann for services provided to Dawn Prosser. It is likewise illogical to re-construct the transaction as New ICC transferring project management services to Jeff Prosser who then gifted the benefit of such services to Dawn Prosser as the owner of Estate Shoys. Neither the funds nor the goods or services purchased with those New ICC funds flowed through Jeff Prosser or his bankruptcy estate at any point in time.[11] New ICC was the transferor, Jerry Mann was the initial transferee, and Dawn Prosser was the sole beneficiary, but gave nothing in return. The foregoing example is also illustrative given that (i) Jeff Prosser has made clear that he has no

---

[11] Perhaps the best example, however, is the cash payments totaling in excess of $65,000 made by one or more of the ICC Debtors in late 2006 and early 2007 directly to Dawn Prosser. It is indisputable that these payments never flowed through Jeff Prosser or his bankruptcy estate.

legally cognizable interest in Estate Shoys (*December 8, 2008 Trial Testimony of Jeff Prosser*, at 169:22-25; *December 9, 2008 Trial Testimony of Jeff Prosser*, at 190:9-13, 199:16-200:2, 201:1-8), (ii) Jeff Prosser has testified that Dawn Prosser received no funds from him for the construction of Estate Shoys (*December 9, 2008 Trial Testimony of Jeff Prosser*, at 201:25-202:19; *February 7, 2007 341 Meeting*, at 32), and (iii) to the contrary, Dawn Prosser was aware, and in some instances personally directed, that Estate Shoys bills be submitted to New ICC for payment (*February 9, 2009 Trial Testimony of Dawn Prosser*, at 60:19-62:13).[12]

This analysis is supported by an abundance of case law. *See e.g. Tese-Milner v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116 (S.D.N.Y. 2003); *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195 (9th Cir. 1997); *General Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801 (9th Cir. BAP 1995); *Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996). The decisions in *Red Dot* and *Video Depot* are particularly instructive.

In *Red Dot*, Thomas Carroll and David Brune owned Red Dot Scenic, Inc. ("Red Dot"). *Red Dot*, 293 B.R. at 117. Carroll and Brune agreed to end their business relationship, and Brune (and not Red Dot) agreed to pay Carroll $57,000 for his interest in Red Dot. *Id.* Brune caused Red Dot to pay Carroll $18,000, which was drawn on corporate checks. *Id.* Red Dot subsequently filed for bankruptcy protection, and the chapter 7 trustee commenced an adversary proceeding against Carroll to recover the $18,000 payments. *Id.* Carroll argued that he was not an initial transferee, but rather a subsequent transferee from Brune who took for value, in good faith, and without knowledge of avoidability. *Id.*

---

[12] Notably, Transfers to vendors working on the construction of the Estate Shoys total in excess of millions of dollars. For example, transfers to K&E Construction Inc., just one subcontractor, totaled more than $1.3 million. Further, significant work was still being performed on Estate Shoys at the Prossers' direction, even after Jeff Prosser and the ICC Debtors were in bankruptcy. *February 9, 2009 Trial Testimony of Dawn Prosser*, at 65:16-68:9.

The *Red Dot* court first explains the "dominion and control" test to determine who is an "initial transferee." *Id.* at 119 (citing *Bonded Fin. Serv. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988)). That is, a party is not a transferee unless he or she has "dominion and control" over the property transferred. *Red Dot*, 293 B.R. at 119. The District Court determined that Brune did not exercise dominion and control over the $18,000 that was transferred to Carroll and that Carroll (and not Brune) was the initial transferee of that transfer. *Id.* at 124.

In so holding, the *Red Dot* court evaluated Carroll's argument that "when Brune used his power as a principal to divert Red Dot's assets to a personal creditor, he asserted dominion and control over the funds at issue, and should be held accountable for using those funds to pay a personal debt." *Id.* at 119. The court held, "The structure and purpose of section 550(a)(1) confirm that a principal does not become an initial transferee simply by using his control over corporate assets to effect a fraudulent transfer." *Id.* at 121. The court explained,

> Like the principal in *Rupp* as well as the principal in the *Bonded* hypothetical, Brune caused the debtor corporation to transfer money direct to a personal creditor. There was no "intermediary step between the Debtor's issuance of the check and the [creditor's] receipt of the funds." *Anton Noll,* 277 B.R. at 882. Although Brune is strictly liable under section 550(a) because he was the party for whose benefit the transfer was made, Carroll was the initial transferee. Thus, he too is strictly liable under the section. An alternative result would be inconsistent with the *Bonded* framework and would contravene the structure and purpose of section 550(a).

*Id.* at 122.

On appeal, the Second Circuit held, "We agree with both the district court's conclusion and its reasoning, and we therefore affirm on the opinion of the district court." *Carroll v. Tese-Milner (In re Red Dot Scenic, Inc.)*, 351 F.3d 57, 58 (2nd Cir. 2003).

The *Video Depot* court utilized a similar analysis as the *Red Dot* court. 127 F.3d 1195. Jeffrey Arlynn was the principal of Video Depot, Ltd. ("Video Depot"). *Id.* at 1196. In order to satisfy some of Arlynn's debts, Arlynn caused Video Depot to purchase a cashier's check in the

amount of $65,000 payable to the Las Vegas Hilton. *Id*. at 1197. Video Depot commenced a

bankruptcy proceeding, and thereafter, the trustee for Video Depot's estate commenced an

adversary proceeding against the Las Vegas Hilton in which it sought to recover the $65,000

fraudulent transfer. *Id*.

The *Video Depot* court framed the Las Vegas Hilton's argument as follows: "First,

Hilton contends that Arlynn, not Hilton, was the initial transferee because Arlynn controlled

Video Depot and directed that the funds be transferred to Hilton. Alternatively, Hilton argues

that Arlynn was the initial transferee because Video Depot's ledger appears to indicate that the

cashier's check was a 'loan' to Arlynn." *Id*. at 1198. As an initial matter, the *Video Depot* court

adopted the "dominion and control" test to determine the identity of the initial transferee. *Id*.

The Court then determined that legal control over the $65,000 passed directly from Video Depot

to the Las Vegas Hilton. *Id*. at 1199. The Court explained as follows:

> Hilton contends that this view elevates form over substance. Whether Video
> Depot, at Arlynn's direction, purchased a cashier's check payable directly to
> Hilton or, instead, issued the funds to Arlynn, enabling him then to write a
> personal check for the sum, there is, so the argument goes, the same result – that
> Arlynn used corporate funds to satisfy a personal debt. What Hilton's argument
> fails to acknowledge, however, is the basic rationale for distinguishing in section
> 550 between initial and subsequent transferees. An initial transferee is exposed to
> stricter liability than a subsequent transferee because an initial transferee is in the
> best position to evaluate whether the conveyance is fraudulent. *See Bonded Fin.
> Servs.*, 838 F.2d at 892-93. Where, as here, a transferee receives funds directly
> from a debtor, the transferee's capacity to monitor – and, accordingly, its burden
> to monitor – is at its greatest.

*Id*. at 1199. Thus, the Court concluded that "Arlynn's control over the business operations of

Video Depot" did not mean that he had dominion and control over the funds that Video Depot

transferred to the Las Vegas Hilton. *Id*. at 1199-1200.

The court next addressed the loan argument advanced by the Las Vegas Hilton:

> Simply referring to the transfer as a "loan" in the company ledger does not
> suffice, however, to demonstrate that at any point in time Arlynn exercised

independent control over the funds. So long as the money remained in Video Depot's account, Arlynn's legal right to it was circumscribed by his duties to the corporation and its creditors. Once the funds were disbursed, Arlynn could use them only to pay Hilton. Regardless of how Hilton chooses to characterize the transfer, Hilton has failed to explain how Video Depot's issuance of a check earmarked expressly for the purchase of a cashier's check to the Las Vegas Hilton gave Arlynn dominion over the funds.

*Id*. at 1200. Even though Arlynn asserted that he paid back the loan (in stark contrast to the facts underlying the Transfers in the case at bar), the court found the Las Vegas Hilton liable for a fraudulent transfer. *Id*.

Applying the analysis of *Red Dot* and *Video Depot*, neither the funds nor the goods or services acquired as a result of the Transfers flowed through Jeff Prosser or his bankruptcy estate to Dawn Prosser. With the exception of Transfers from which he too benefitted (*i.e.* where there were multiple beneficiaries), Jeff Prosser's only involvement with the Transfers was the fact that he caused the ICC Debtors to make them.[13] Aside from the Transfers made directly to Dawn Prosser (in which case Dawn Prosser would be the initial transferee), the third parties who received the Transfers were the initial transferees and Dawn Prosser was the admitted beneficiary of those Transfers. Trustee Springel is clearly entitled to recover the Transfers, or the value thereof, from Dawn Prosser. *See* 11 U.S.C. § 550(a); *Rupp v. Markgraf*, 95 F.3d 936, 943 (10th Cir. 1996) ("Concluding here, as we do, that Davis is the person for whose benefit the transfer was made and that the Markgrafs are the initial transferees permits the trustee in this case to recover under Section(s) [sic] 550 from either party.").

As the Transfers did not flow through Jeff Prosser or his bankruptcy estate to Dawn Prosser, Trustee Springel, acting for the ICC Debtors, is the proper party entitled to full recovery with respect to the Transfers.

---

[13] While Dawn Prosser's submission of certain invoices for payment by New ICC certainly evidences her awareness that the Transfers were made by New ICC, Jeff Prosser's involvement in causing the Transfers to be made satisfies the requisite elements.

### B. The Transfers Were Fraudulent under Applicable State Laws and Bankruptcy Code § 548

#### 1. *Jeff Prosser Caused the ICC Debtors to Make the Transfers to or for the Benefit of Dawn Prosser*

Trustee Springel asserts claims and causes of action against Dawn Prosser pursuant to Bankruptcy Code § 548 and the laws of Florida, New York, and the U.S. Virgin Islands, as incorporated by Bankruptcy Code § 544(b).[14] Each of those laws recognizes claims and causes of action to recover damages on account of, and to avoid, fraudulent transfers made with actual or constructive fraud.

In proving Trustee Springel's fraudulent transfer claims and causes of action, the conduct of Jeff Prosser, the ultimate principal of the ICC Debtors and an officer and director of New ICC, must be imputed to the ICC Debtors. *See Leonard v. Coolidge (In re Nat'l Audit Defense Network)*, 367 B.R. 207, 221 (Bankr. D. Nev. 2007) ("With a corporate transferor such as NADN, the relevant intent is the intent of its officers and directors . . . ."); *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 161 (Bankr. E.D. Va. 2007) ("[T]he fraudulent intent of an officer or director may be imputed to the Debtors for purposes of recovering an intentional fraudulent transfer."); *see also Thabault v. Chait*, 541 F.3d 512, 527 (3d Cir. 2008) ("[I]f an agent is the sole representative of a principal, then that agent's fraudulent conduct will be imputed to the principal regardless of whether the agent's conduct was adverse to the principal's interests.").

#### 2. *Jeff Prosser Caused the ICC Debtors to Make the Transfers with Actual Intent to Hinder, Delay, or Defraud Creditors*

Pursuant to Bankruptcy Code § 548 and the laws of Florida, New York, and the U.S. Virgin Islands, as incorporated by Bankruptcy Code § 544(b), a trustee generally may recover a

---

[14] The applicable state and territorial fraudulent transfer laws include FLA. STAT. § 726.101 (2008) *et seq.*; N.Y. DEBT. & CRED. LAW § 270 (McKinney 2008) *et seq.*; and 28 V.I.C. § 171 (2007) *et seq.*

transfer that was made with actual intent to hinder, delay, or defraud a present or future creditor. *See e.g.* 11 U.S.C. § 548(a)(1)(A); Fla. Stat. § 726.105(1)(a); N.Y. Debt. & Cred. Law § 276; and 28 V.I.C. § 204. However, the trustee need not demonstrate that a fraudulent transfer was made with actual intent to hinder, delay, or defraud a *particular* present or future creditor. *See* 5 *Collier on Bankruptcy* ¶ 548.04[1] (Lawrence P. King ed., 15th ed. 2008) ("Actual fraudulent intent requires a purposeful act intended specifically to defraud creditors, although it is not necessary that any particular creditor be the subject of this intent, *as evidenced by the fact that the statute's protections extend to those creditors whose claims did not yet arise at the time of the transaction in question*.") (emphasis added).

As the intent to hinder, delay, or defraud creditors is difficult to prove by direct evidence, courts rely on certain badges of fraud. *See In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) ("Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to admit such an intent, courts may infer actual intent by examining the circumstances and considering whether various 'badges of fraud' are present."). Courts have routinely held that when seeking to avoid a fraudulent transfer on the basis of actual fraud a trustee must prove by clear and convincing evidence a "goodly" number of the badges of fraud. *In re Pinto Trucking Service, Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988).[15] Such badges of fraud include, but are not limited to the following:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) [whether] the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset

---

[15] As evidenced by the *Pinto Trucking* court's statement, no one badge of fraud must be proven to demonstrate intent to hinder, delay, or defraud.

transferred or the amount of the obligation incurred; (9) the debtor was insolvent or become insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Hill*, 342 B.R. at 198.[16] Trustee Springel will demonstrate that multiple badges of fraud are present with regards to the Transfers, including, but not limited to, the following:

- At all relevant times, Jeff Prosser was the sole member of ICC-LLC, which was the ultimate parent company of ECI and New ICC, and he was the President and Chairman of the Board of Directors of New ICC.

- While in those capacities, Jeff Prosser caused the ICC Debtors to make the Transfers to or for the benefit of Dawn Prosser. As a result, he was on both sides of the transactions. The Transfers did not have a legitimate business purpose; in fact, they were in satisfaction of and in contemplation of personal expenses of Dawn Prosser. Dawn Prosser is an insider, as such term is defined in Bankruptcy Code § 101(31), and never was employed by or provided any services to any of the ICC Debtors.

- Although Jeff Prosser testified that decisions regarding his salary had to be presented to the New ICC Board of Directors, Jeff Prosser neither provided disclosure to, nor obtained approval of, the board of directors of New ICC prior to causing New ICC to make any of the Transfers. *December 8, 2008 Trial Testimony of Jeff Prosser*, at 89:21-90:3; *December 9, 2008 Trial Testimony of Jeff Prosser*, at 227:9-16. The New ICC Board of Directors did not know about or approve any payments to or for the benefit of Dawn Prosser. *Deposition Testimony of Board Member Michael Prosser*, taken April 25, 2008, at 44:3-19, 45:3-22, 49:11-18, 83:10-18, 206:18-20; *September 9, 2008 Exemptions Trial Testimony of John Raynor*, at 121:14-122:6. To the contrary, the Transfers were not approved by the New ICC Board of Directors or anyone else at New ICC other than Jeff Prosser. *December 9, 2008 Trial Testimony of Jeff Prosser*, at 214:9-19.

- In fact, at various points in time Jeff Prosser directed Dennis Kanai, Eling Joseph and others to recharacterize certain transactions so that such transactions would not appear personal in nature. For instance, personal furnishings for the Palm Beach house were recharacterized as office equipment or furniture and a Mercedes SLK 350 for Jeff Prosser's daughter recharacterized as "equipment". *March 23, 2009 Trial Testimony of Eling Joseph*; at 23:16-26:4. After the

---

[16] Given the similarities between state fraudulent transfer laws and Bankruptcy Code § 548, federal courts often apply state law decisions to the federal fraudulent transfer law and *vice versa*. *See Venice-Oxford Ass'n v. Multifamily Mortgage Trust 1996-1 (In re Venice-Oxford Ass'n)*, 236 B.R. 820, 834 (Bankr. M.D. Fla. 1999); *Voiland v. Gillissie (In re Gillissie)*, 215 B.R. 370, 372-78 (Bankr. N.D. Ill. 1997).

appointment of Trustee Springel, Dennis Kanai, Chief Financial Officer of New ICC, was directed by Jeff Prosser to go back and recharacterize New ICC transactions so that they would appear to be business-related. *March 10, 2009 Trial Testimony of Dennis Kanai*, at 60:6-68:5; 144:13-145:1.

- Jeff Prosser tried to hide certain assets purchased by one or more of the ICC Debtors, such as Pissarro paintings he directed to be put on loan to the Jewish Museum only "because of the bankruptcy situation." *March 23, 2009 Trial Testimony of Eling Joseph*, at 44:21-48:15.[17]

- The Transfers were made after Jeff Prosser and his companies had been targeted with enormous claims and formal lawsuits:

  - On or about June 1, 1998, Brickell Partners commenced a fiduciary duty class action in the Delaware Chancery Court on behalf of former public shareholders of Emerging Communications, Inc. On April 10, 2001, the Greenlight Entities filed a separate fiduciary duty action against Jeff Prosser, ICC-LLC and Innovative Communication Corporation[18] also in the Delaware Chancery Court. These two fiduciary duty actions were consolidated and tried in the Fall of 2001. The Greenlight Entities prevailed in both actions, and an opinion was issued by the Delaware Chancery Court on June 4, 2004. A judgment was entered in favor of the Greenlight Entities on January 9, 2006 in the amount of over $56 million plus interest.[19]

  - In June 2004, the Rural Telephone Finance Cooperative (the "RTFC") initiated court actions against Jeff Prosser and New ICC for a declaratory judgment that (i) certain defaults existed under that certain Loan Agreement dated August 27, 2001 by and among the RTFC, New ICC, and Jeff Prosser; and (ii) that it could (A) declare as due and payable all principal and interest owed pursuant to that loan agreement and prior loans, and (B) exercise its other rights and remedies. On June 8, 2006, this Court entered a judgment in favor of the RTFC against New ICC and Jeff Prosser, which granted the RTFC a judgment against New ICC and Prosser in the principal amount of $524,910,065, but with Jeff Prosser's personal liability capped at $100 million

---

[17] Moreover, since January 2008, Jeff Prosser and Dawn Prosser previously have invoked the Fifth Amendment privilege in response to matters such as (i) questioning at depositions and 341 creditor meetings; (ii) requests for production; and (iii) requests for admission. Unlike the rule in criminal cases, reliance on the Fifth Amendment in civil cases may give rise to adverse inferences against the party claiming its benefits. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *Secs. & Exch. Comm'n v. Graystone Nash,* 25 F.3d 187, 190 (3rd Cir. 1994).

[18] Known at that time as "Old ICC."

[19] In this judgment, among other things, Jeff Prosser was found guilty of fraud, deceit, or manipulation in a fiduciary capacity.

- Accordingly, at the time that Jeff Prosser caused the ICC Debtors to make the Transfers, Jeff Prosser and his affiliates were both involved in, and certainly aware of, litigation which ultimately gave rise to a substantial claim against them, which was beyond their ability to pay.

- The vast majority, if not all, of the Transfers were made at a time at which New ICC (i) had negative equity according to its financial statements; and (ii) was insolvent, not only on a balance sheet basis, but as further evidenced by numerous other indicators of insolvency, including, but not limited to, the fact that New ICC had difficulty with cash flow and making timely payments to vendors, and failed to generate sufficient cash to satisfy current and future obligations, such as its employee benefit plans and its indebtedness to the RTFC.

- In addition, dating back to 1999, Jeff Prosser already had specific outstanding obligations owing to New ICC in the amounts of $9.9 million and $1.8 million, as reflected in the Consolidated Financial Statements for New ICC and its subsidiaries for the years 1999 and 2000. *March 10, 2009 Trial Testimony of Dennis Kanai*, at 20:8-21:6. Jeff Prosser never repaid those amounts nor made any interest payments with respect to those obligations. *Id*. Jeff Prosser also had an outstanding amount due of approximately $21 million dollars, independent of the aforementioned amounts. *March 10, 2009 Trial Testimony of Dennis Kanai*, at 21:18-24:7. That amount was never repaid, nor was interest ever paid on that obligation. *Id*. Similarly, ICC-LLC had significant outstanding obligations to New ICC in the amount of approximately $58 million dollars, and the entire $58 million dollar obligation was guaranteed personally by Jeff Prosser. *March 10, 2009 Trial Testimony of Dennis Kanai*, at 21:18-24:7. Neither ICC-LLC nor Jeff Prosser ever made any interest or principal payments on that obligation. *March 10, 2009 Trial Testimony of Dennis Kanai*, at 21:18-24:7, 137:19-138:5. By the year 2000, Jeff Prosser had total obligations to New ICC of over $90 million in principal, which he never repaid. *Id*.

- Nonetheless, the amounts taken by Prosser continued to grow. On December 31, 2001, Jeff Prosser expressly affirmed to BDO Seidman he directly and indirectly owed the amount of $111,374,000 to New ICC. *March 26, 2009 Trial Transcript*, at 170:13-171:1. As a result of the continuing remittances made by new ICC to Prosser's personal behalf, the last audited financial statements prepared for New ICC reflect that the capital deficit owed had grown to $265 million as of December 31, 2004, and to $292 million as of December 31, 2005. *March 10, 2009 Trial Testimony of Dennis Kanai*, at 47:3-18. As reflected in the audited financial statements from 1999 forward, every year the balance owed grew, putting New ICC deeper and deeper in the red. *Id*.; *New ICC Financial Statements; March 10, 2009 Trial Testimony of Dennis Kanai*, at 48:19-49:10.

- Although most of the Transfers were reflected as a New ICC asset in the due from shareholder account on New ICC's general ledger (referred to interchangeably herein as the "Due From Account", "Contra-Equity Account" and/or "Receivables

<u>LLC Account</u>"), Jeff Prosser admittedly never had an intent to re-pay the amounts reflected in that account. Those were simply bookkeeping entries in an effort to track all of the money being taken from New ICC for his and/or Dawn Prosser's sole use and personal benefit. In fact, some members of the New ICC Board of Directors were under the misimpression that the Due From Account functioned to reimburse Jeff Prosser for actual business expenses that he had paid personally, simply "to compensate him for his having borne certain expenses of the company." *September 8, 2008 Exemptions Trial Testimony of Board Member Richard Goodwin*, at 189:16-190:3. Boiled down to its essence, money was going out of New ICC faster than it could be replaced and it had to be accounted for somehow. Moreover, New ICC's auditors required all transfers be reflected on the company's books.

- Despite belatedly claiming that he treated the amounts posted to the Due From Account as taxable income to Dawn Prosser and him, Jeff Prosser was unable to identify anywhere in their joint tax returns for the years 1999-2006 where such personal transfers to the Prossers (from the companies' operating accounts) were taken as income to them or accounted for in any way.[20]

- Jeff Prosser caused New ICC to make Transfers to or for the benefit of Dawn Prosser in an effort to remove such property from the reach of the creditors of New ICC.

These badges of fraud and other facts elicited at trial will establish that the Transfers were made with actual intent to hinder, delay, or defraud creditors. As a result, the Transfers are fraudulent transfers that Trustee Springel may avoid.

3. ***Jeff Prosser Caused the ICC Debtors to Make the Transfers with Constructive Fraudulent Intent***

Pursuant to Bankruptcy Code § 548 and the laws of Florida, New York, and the U.S. Virgin Islands, as incorporated by Bankruptcy Code § 544(b), a trustee generally may recover a transfer if the transferor received less than reasonably equivalent value (or less than fair consideration) for the transfer and was unable to satisfy its debts, left with unreasonably small capital, insolvent, or thereby rendered insolvent. *See e.g.* 11 U.S.C. § 548(a)(1)(B); FLA. STAT. § 726.105(1)(b) & 726.106; N.Y. DEBT. & CRED. LAW § 273, 274, & 275; and 28 V.I.C. § 204,

---

[20] While the evidence demonstrates otherwise, even if Jeff Prosser and Dawn Prosser did pay taxes on the Transfers, this does not make the Transfers not fraudulent.

205, & 206.  Because, as previously stated, Trustee Springel will demonstrate that the ICC Debtors did not receive reasonably equivalent value (in fact, no value was received) for the Transfers and that those Transfers were made at a time at which the ICC Debtors were unable to satisfy their debts, left with unreasonably small capital, insolvent or thereby rendered insolvent, the Transfers are also constructively fraudulent.

There are numerous indicators of insolvency present.  Specifically, as evidenced by New ICC's financial statements and according to New ICC's Chief Financial Officer (among others) (i) New ICC was insolvent on a balance sheet basis; (ii) had difficulty with cash flow and making timely payments to vendors; (iii) failed to generate sufficient cash to satisfy current and future obligations, such as its employee benefit plans and its indebtedness to the RTFC; (iv) was confronted with a mammoth claim by former shareholders for hundreds of millions of dollars; and (v) displayed other characteristics of insolvency.[21]  As a result, the Transfers are fraudulent transfers that were made with constructive fraud.

4.      ***Even If the Court Determines that the Transfers Were Initially Distributions to Jeff Prosser, They Remain Fraudulent Transfers as to Dawn Prosser  that Must Be Returned to the ICC Debtors***

On various occasions, Jeff and Dawn Prosser seem to allege that the Transfers were compensation to Jeff Prosser for services rendered.  Other times, those parties have alleged that the Transfers were some form of distribution to Jeff Prosser.  Compensation (which is paid in consideration for the rendering of services) and distributions (which are made on account of an equity surplus interest in an entity) are mutually exclusive, and the Transfers could not be both.

---

[21] Of course, insolvency is only relevant should the Court find that Trustee Springel has not proven actual fraudulent intent, as insolvency is wholly irrelevant to that inquiry.  Trustee Springel believes that he will more than adequately demonstrate that the transfers at issue in the Fraudulent Transfer Actions were made with actual intent to hinder, delay, or defraud creditors.

As an initial matter, Trustee Springel notes that the oft-repeated battle cry that each of the Transfers was "run through contra-equity and taken as income on the joint tax returns of Jeff and Dawn Prosser" is not the saving grace that Dawn Prosser would have this Court believe. Solely because an individual pays taxes on amounts (fraudulently or otherwise) channeled to that individual does not mean that such amounts were properly transferred to that individual. Nonetheless, the Transfers were not compensation to Jeff Prosser. To the contrary, the actual facts demonstrate that in Jeff Prosser's tax returns, he never recognized income from "wages, salaries, tips, etc." in excess of $2,100,000 and that on an annual basis, the Transfers overwhelmingly exceed, in fact dwarfed, this amount. Further, the Transfers do not fit any of the characteristics of typical compensation in that they were neither made on account of hours worked, results achieved, or performance, nor tied to any particular service rendered.[22]

Even if the Transfers are "distributions," they remain fraudulent transfers.[23] As discussed above, the ICC Debtors were insolvent at all relevant times. As a result, any "distributions" would be fraudulent transfers as a matter of law. *See Mancuso v. Champion (In re Dondi Fin. Corp.)*, 119 B.R. 106, 113 (Bankr. N.D. Tex. 1990) ("Looking at the plain language of the fraudulent conveyance statute, it appears that a dividend payment made while the debtor

---

[22] Indeed, if the Transfers were proper income to the Prossers, as has been alleged, then why are none of the Transfers reflected within (i) Jeff Prosser's Statement of Financial Affairs (e.g. Questions 1 and 2); (ii) his Monthly Operating Reports; or (iii) ICC-LLC's Monthly Operating Reports? If the Transfers were proper compensation, why was no one on the New ICC Board of Directors aware of the expenditure of New ICC's operating capital to the personal benefit of Dawn Prosser? And why did Jeff Prosser not receive a W-2 and pay withholding taxes regarding the Transfers?

[23] Alan Barbee, designated expert witness for Trustee Carroll, testified that payments that merely confer an incidental benefit to a shareholder – such as the Transfers to or for the benefit of Dawn Prosser – do not constitute a distribution; a distribution must be primarily for the benefit of the shareholder. *March 23, 2009 Trial Testimony of Alan Barbee*, at 254:5-12. Alan Barbee further testified that simply because something is characterized as a distribution after the fact does not mean that it was proper or authorized. *March 23, 2009 Trial Testimony of Alan Barbee*, at 245:20-249:20. As a result, the Bankruptcy Court previously noted that the true import of Mr. Barbee's testimony is that the Transfers had to be classified somehow to account for the fact that large amounts of money were constantly flowing out of the company. *See, e.g.*, July 23, 2009 Transcript, at 54:12-25. And it was all with no benefit to the company. Importantly, Barbee never opined that the distributions were not fraudulent transfers.

corporation was insolvent is a fraudulent conveyance."); *Pereira v. Equitable Life Insur. Society of the United States (In re Trace Int'l Holdings, Inc.)*, 289 B.R. 548, 561 (Bankr. S.D.N.Y. 2003) ("[E]ven if the Movants were contractually entitled to the payment of dividends under the Trace Charter or by virtue of contract, Trace's insolvency would have prohibited Trace from performing that contract, and rendered any dividends paid subject to recovery by the Trustee.").

The *Dondi* decision is instructive. In *Dondi*, a chapter 7 trustee filed a complaint against Ray Champion ("Champion"), a shareholder of Dondi Financial Corporation ("Dondi") and an employee of an affiliated entity, in which the trustee sought to avoid fraudulent conveyances made by Dondi to Champion. *Dondi*, 119 B.R. at 107. Those alleged fraudulent conveyances were on account of dividends made to Champion as a shareholder of Dondi. *Id*. at 108. Champion received shares of Dondi as part of a compensation package that included salary and other benefits. *Id*. at 107. The Court determined that at all relevant times, Dondi was insolvent. *Id*. at 107. The *Dondi* court next addressed whether the dividends were given in exchange for fair consideration. *Id*. at 112. In determining that they were not, the Court observed that "the dividend payments themselves were not compensation" because they were not related to Champion's service or performance. *Id*. at 113. As a result, the *Dondi* court held, "[A] dividend payment made while the debtor corporation was insolvent is a fraudulent conveyance." *Id*. The Court made this ruling despite finding that "[d]uring all pertinent times herein, Defendant had no knowledge of Debtor's solvency problems." *Id*. at 107.

Thus, even if the Transfers are distributions, they are fraudulent transfers because they were made at a time at which the ICC Debtors were insolvent.

### C. The Post-Petition Transfers Were Not Authorized under the Bankruptcy Code or pursuant to Order of the Court

Bankruptcy Code § 549(a) provides,

(a)      Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

      (1)      that occurs after the commencement of the case; and

      (2)      (A)      that is authorized only under section 303(f) or 542(c) of this title; or

              (B)      that is not authorized under this title or by the court.

11 U.S.C. § 549(a).

As previously outlined, in addition to the Pre-Petition Transfers, there were also Post-Petition Transfers made to Dawn Prosser. The Post-Petition Transfers by the ICC Debtors to Dawn Prosser were not authorized under the Bankruptcy Code or by Order of the Bankruptcy Court. Dawn Prosser herself does not contest the fact that she never provided any value whatsoever, much less reasonably equivalent value, for the Transfers. Therefore, the Post-Petition Transfers were made without any consideration provided by Dawn Prosser, and are properly avoidable pursuant to Bankruptcy Code § 549(a).

## IV. CONCLUSION

Based on the statutory authority and case law presented in this *Pre-trial Memorandum* as well as the facts, the Transfers constitute both intentional fraudulent transfers and constructive fraudulent transfers to Dawn Prosser. Accordingly, the Court should enter judgment against Dawn Prosser and in favor of Trustee Springel.

Dated: February 4, 2011

By:   /s/ Michaela C. Crocker
      James J. Lee, SBT #12074550
      Duston K. McFaul, SBT #24003309
      Michaela C. Crocker, SBT #24031985
      Rebecca L. Petereit, SBT #24062776
      **VINSON & ELKINS L.L.P.**
      Trammell Crow Center
      2001 Ross Avenue, Suite 3700
      Dallas, Texas 75201
      Tel:  214.220.7700
      Fax: 214.220.7716

      **COUNSEL FOR STAN SPRINGEL,
      CHAPTER 11 TRUSTEE**

      - and –

      Benjamin A. Currence
      **LAW OFFICES OF BENJAMIN A.
      CURRENCE**
      5045 Norre Gade, Ste. 2
      P.O. Box 6143
      St. Thomas, VI 00804-6143
      Tel:  (340) 775-3434
      Fax: (340) 774-1001

      **LOCAL COUNSEL FOR STAN
      SPRINGEL, CHAPTER 11 TRUSTEE**